## Bell et al. v. Sampson, Governor et al.

(Decided January 17, 1930.)

378

JOHN MARSHALL, JR., and WOODWARD, HAMILTON & HOBSON for appellants.

ARTHUR B. BENSINGER, HERMAN G. HANDMAKER, B. J. BETHURUM and J. C. BIRD for appellees.

OPINION OF THE COURT BY JUDGE DIETZMAN—Affirming.

By chapter 77 of the Acts of 1926, a state text-book commission was created. Section 1 of that act provides:

"There is hereby created a State Text Book Commission which shall consist of twelve members, two of whom shall be ex officio members, namely, the Governor of the Commonwealth, and the State Superintendent of Public Instruction, and ten of whom shall be appointed by the Governor at such time or times and in the manner hereinafter provided.

"All members first appointed under this act shall be appointed during the month of April, 1926. Five of the members so appointed shall serve for two years, and five for four years from and after their appointment, and until their successors are appointed and qualified, the terms of the respective members to be designated in their appointment.

Upon the expiration of the term for which each of said members is appointed, his successor shall be appointed for a period of four years. Thereafter, the terms of each and all appointive members shall in like manner be for a period of four years and the appointments shall be so made that the terms of five members expire every two years, thus providing for a continuous commission having thereon at each adoption of books a majority of experienced members. All vacancies on said commission shall be filled for the unexpired term in the same manner as original membership is determined.''

We are informed that, as originally prepared, this act carried an emergency clause. However, as passed, it did not contain such a clause, and hence did not become effective until in June of that year. On April 28, 1927, the Honorable W. J. Fields, then Governor of Kentucky, appointed as members of this state text-book commission Frank L. McVey, R. A. Edwards, Wm. Pearce, H. T. Peters, L. H. Powell, P. H. Hopkins, B. W. Hartley, H. C. Burnett, R. W. Kincaid, and Mrs. Pearl Hindman Harris, for a term of four years each from that date. All of these appointees, with the exception of Dr. McVey, who is not involved in this litigation, and Wm. Pearce and Mrs. Harris, who declined to join in the bringing of this suit, are parties plaintiff. On December 12, 1927, Governor Fields, having been informed that five of his appointments should have and could only have been made for a term of two years, revoked the appointment of R. A. Edwards, H. W. Peters, P. H. Hopkins, H. C. Burnett, and P. H. Harris for the four-year terms, and reappointed them for a term of two years each from April 28, 1927. These appointments of the Governor were duly entered on the Executive Journal, by the secretary of state, pursuant to section 91 of the Constitution, which, among other things, provides as to the duties of the secretary of state:

''The secretary of state shall keep a fair register of and attest all the official acts of the governor, and shall, when required, lay the same and all papers, minutes and vouchers relative thereto before either house of the general assembly.''

The 1928 session of the General Assembly passed without any action on its part concerning these appoint-

ments of Governor Fields. On September 12, 1928, the Honorable Flem D. Sampson, then and now the Governor of this commonwealth, revoked these appointments of Governor Fields, and in lieu thereof appointed Dr. Frank L. McVey and the defendants, Samuel Walker, L. B. Stephen, K. R. Cummins, and Miss Delphia Evans, as members of this state text-book commission, for a term of four years each from April, 1928, and John H. Pickett, Henry O. Gray, Frank V. McChesney, Robt. J. Nickel and W. R. McCoy as such members for a term of two years each from April, 1928. Thereupon the plaintiffs brought this suit to enjoin the defendants from undertaking to act as the state text-book commission and from in any wise interfering with the plaintiffs while acting as such commission. The defendants counterclaimed, asking like relief against the plaintiffs. As Dr. McVey, an appointee of Governor Fields, had been reappointed by Governor Sampson, no relief was asked by either side as to him. On motion by both sides for a temporary injunction, the chancellor being of the opinion that the terms of office of the two-year appointees of Governor Fields had expired in April, 1928, and that therefore there was a vacancy as to them which Governor Sampson had a right to fill, refused to enjoin the four-year appointees of Governor Sampson; but, being also of the opinion that the four-year appointments of Governor Fields had not yet expired, he did enjoin the two-year appointees of Governor Sampson. Per contra, he enjoined the two-year appointees of Governor Fields and declined to enjoin his four-year appointees.

Thereupon, pursuant to section 296 of the Civil Code of Practice the defendants moved one of the judges of this court to dissolve the injunction granted against the two-year appointees of. Governor Sampson and to grant the injunction refused against the four-year appointees of Governor Fields. The plaintiffs made a like motion as to the two-year appointees of Governor Fields and the four-year appointees of Governor Sampson. In an order concurred in by the whole court, the motion of the plaintiffs was overruled, while that of the defendants was sustained. On the return of the case to the lower court, a final judgment was entered in accordance with the order last mentioned, and from this judgment, the defendants have appealed.

We are confronted at the outset with the question whether or not appointments to the state text-book commission as provided for by the act creating that body, are subject to confirmation by the Senate. Although we have no general constitutional provision providing for confirmation by the Senate of executive appointments we do have a statute which, in part, reads:

> "Unless otherwise provided, all persons appointed to an office by the governor, whether to fill a vacancy, or as an original appointment, shall hold office, subject to the advice and consent of the senate, which body shall take appropriate action upon such appointments at its first session held thereafter."
> Ky. Stats., sec. 3750.

In the case of Sewell v. Bennett, 187 Ky. 626, 220 S. W. 517, 520, we had before us the question of the application of this section of the Statutes to the appointments of members of the Workmen's Compensation Board. The Workmen's Compensation Act was passed by the 1916 session of the Legislature. So far as the appointments to the Compensation Board were concerned, it became effective by its terms in April of that year. Chapter 33, Acts of 1916, sec. 81. The act provided for the appointment of three members to the Compensation Board, and the question was whether such appointments had to be confirmed by the Senate pursuant to section 3750 of the Statutes or not. In holding that they did, we said:

> "It was manifestly the purpose of the Legis-lature in adopting the sections in this chapter to make provision for omissions and deficiencies in special acts, of which there are great numbers, creating offices and officers, and that the Legislature had the power except in so far as it was restrained by the Constitution, to enact these general provisions relating to offices and officers, will not be controverted, nor will it be disputed that these general provisions, in so far as applicable and not in conflict with the provisions of the legislative acts creating offices and officers, are to be read in connection with and as a part of such acts. . . .
> "With this understanding of its purpose and effect, I come now to consider whether section 3750 should be read into and considered as a part of the sections of the Workmen's Compensation Act relat-

ing to members of the board; and it will be at once seen that this is the principal question in the case, because, if section 3750 has no application to members of the board, then neither Gov. Morrow nor the Senate, acting separately or in concert, had the power to remove either Allington or Sewell during the terms for which they were appointed except for cause. On the other hand, if this section is to be read into and as a part of the related sections of the Compensation Act, Bennett and Levi are entitled to the offices.

"It will readily be seen, and indeed is not questioned, that there is no apparent conflict on the face of the Statute between section 4920 of the Compensation Act and section 3750. Section 4920 merely provides that the board shall be 'appointed by the Governor,' while section 3750 simply stipulates that, unless it is 'otherwise provided' all persons appointed to an office by the Governor shall hold it subject to the advice and consent of the Senate. This section does not in any manner interfere with the power of the Governor to appoint. It merely provides that, when he does appoint, his appointment shall be subject to the approval of the Senate. It only adds to or supplements the provisions of the Compensation Act by declaring that the appointments made by the Governor must be submitted by him to the Senate for its approval or rejection. . . .

"Section 3750, in simple and unmistakable language, declares that: 'Unless otherwise provided, all persons appointed to an office by the Governor, whether to fill a vacancy, or as an original appointment, shall hold the office subject to the advice and consent of the Senate.'

"Now what do the words 'Unless otherwise provided' mean in connection with the point under consideration? These words are in common and general use, have no technical meaning, and should be given that construction that will carry out their purpose according to their commonly understood usage. The word 'otherwise' is, of course, the controlling word in this group of words, and, as defined by Webster, 'otherwise' means 'in a different manner; in another way; or in other ways, contrarily; another way or manner; and it is according to these defi-

nitions that the word 'otherwise' is commonly used and understood.

"It is further plain that the words 'unless otherwise provided' have reference to something that follows that appointment by the Governor, and unless the act creating the office makes some provision whereby the appointment shall be subject to the advice and consent of some other person or body, or provides that the appointment shall not be subject to the advice and consent of any other person or body, it cannot be said that the act has 'otherwise' provided that the appointment shall not be made subject to the advice and consent of the Senate.

"Clearly the mere failure of the act to make any provision whatever concerning the approval or rejection of the appointment after it has been made is not either in spirit or in substance a provision that the appointment shall not be subject to the advice and consent of the Senate. In order to defeat the meaning and purpose of this last sentence in section 3750, the act creating the office must in terms or in substance make some provision contrary to the meaning and effect of the sentence, and this the Legislature could easily have done if it had wanted to by providing that the appointment should not be subject to the advice and consent of the Senate, or that the appointment should be approved in some other manner or way.

"It is further insisted that the words, 'Unless otherwise provided, all persons appointed to an office by the Governor, whether to fill a vacancy, or as an original appointment, shall hold office, subject to the advice and consent of the Senate, which body shall take appropriate action upon such appointments at its first session held thereafter,' were intended to apply only to officers who were appointed by the Governor by and with the advice and consent of the Senate.

"In other words, the argument is that, when the act creating an office and officer provides that the officer shall be appointed by the Governor by and with the advice and consent of the Senate, but makes no provision for filling vacancies by and with the advice and consent of the Senate, the quoted words should be read into and as a part of the act, and accordingly vacancy appointments in such an act

must be submitted to the Senate as the original appointments are required to be. This argument, of course, assumes that original appointments to the Compensation Board are not subject to the advice and consent of the Senate, and if this were so neither would vacancy appointments be subject to the advice and consent of the Senate. But having, as heretofore stated, reached the conclusion that original appointments under this act must be submitted to the Senate for its advice and consent, it necessarily follows, if the last sentence in section 3750 is to be given any effect, that vacancy appointments must also be submitted to the Senate.

"This last sentence is well written and its meaning expressed in simple and easily understood words. It refers as plainly as language can make it to 'all persons appointed to an office by the Governor, whether to fill a vacancy, or as an original appointment,' and declares that all persons so appointed 'shall hold office, subject to the advice and consent of the Senate, which body shall take appropriate action upon such appointment at its first session held thereafter.' There is no limitation or restriction in this sentence. It is as broad as it could be phrased, and covers every vacancy and every original appointment, unless 'otherwise provided' in the act, creating the office and officer."

Applying the holding and the reasoning of the Sewell case to the instant one, we find that the act creating the state text-book commission does not in terms exempt the appointments to that commission from the necessity of confirmation by the Senate. This much is conceded. But it is insisted that the act "in substance" does effect such exemption, and that under the Sewell case, if this be true, confirmation by the Senate is unnecessary. Although, as the Sewell case pointed out, the mere failure of an act to make any provision whatever concerning the approval or rejection of an appointment after it has been made is neither in spirit *nor in substance* a provision that the appointment shall not be subject to the advice and consent of the Senate, it is argued that we have here more than such "mere failure," in that the section creating the text-book commission itself states that its purpose is to provide for a continuous commission having at each adoption of books a

majority of experienced members, which could hardly be accomplished if appointments required to be made almost two years in advance of the meeting of the Senate should be rejected by it when it did meet, and, further, in that the first adoption of text-books, taking place in January, 1929, would be past, and one-half of the work of the 1928 appointees completed, before their appointments could be confirmed. In other words, the test urged by the appellants is the assumed intention of the Legislature, arrived at by the supposed practical working of the act. That the Sewell case never meant such a test, when it used the language that an act creating an office must in terms or *in substance* exempt the appointment to such office from the provision of section 3750 of the Statutes in order to obviate the necessity of a confirmation by the Senate is clear to us. The Sewell case meant by the use of the term "in substance" just what it said earlier in the opinion:

> "Unless the act creating the office makes some provision whereby the appointment shall be subject to the advice and consent of some other person or body, or provides that the appointment shall not be subject to the advice and consent of any other person or body, it cannot be said that the act has 'otherwise' provided that the appointment shall not be made subject to the advice and consent of the Senate."

And again, after using the expression "in substance" now seized upon:

> "In order to defeat the meaning and purpose of this last sentence in section 3750, the act creating the office must in terms or in substance make some provision contrary to the meaning and effect of the sentence, and this the Legislature could easily have done if it had wanted to *by providing that the appointment should not be subject to the advice and consent of the Senate, or that the appointment should be approved in some other manner or way.*" (Italics ours.)

To adopt the test advanced by the appellants would defeat the operation of section 3750 of the Statutes in most instances. The fact that the appointments to the state text-book commission are to be made after the adjournment of the Legislature is not at all indicative

of the legislative intent concerning the requirement of confirmation by the Senate. Almost, if not all, of the offices to be filled by the Governor's appointment have their terms beginning after the adjournment of the Senate. That was true of the Compensation Board. The appointments to that board were to be made in April following the adjournment of the Senate, just as these to the text-book commission were to be made in April also following the adjournment of the Senate. The appointments to neither the Compensation Board nor the textbook commission could be confirmed until almost two years after they had been made, unless, perchance, a special session of the Senate were called in the meantime. Further, the vast majorities of vacancies in office filled by appointment by the Governor occur when the Senate is not in session, and yet the Sewell case holds that appointments to fill such vacancies are subject to confirmation by the Senate. To hold that the fact that the filling of an office is to take place during the recess of the Senate is indicative of a legislative intent to exempt such appointment from the necessity of confirmation by the Senate, would, in the light of what we have said about the beginning of the terms of most of our offices, amount to a practical repeal of section 3750 of the Statutes. We do not think the Legislature ever contemplated such a result.

Nor does the fact that section 1 of the act stated that its purpose was to provide for a continuous body composed of a majority of experienced members lead to a different conclusion. Such, in reality, is the purpose of the Legislature with regard to most of the boards it creates, with the terms of office of the members expiring at different times. Such a provision, as in the case of the Compensation Board, indicates a purpose of having on such board a majority acquainted with the duties and responsibilities of the office. Yet this was not considered in the Sewell case as affecting the necessity of confirmation by the Senate. The provision in the act under discussion for a continuous body of experienced members was only a reason advanced by the Legislature for the making of the terms of the members to expire at different times. The reason would have been just as clearly understood had it not been expressed. Further, the very operation of the act defeats in a measure this expressed purpose or hope, for in those years when a new Governor and new superintendent of public instruction come

into office, they together with the five members to be appointed the following April, will compose a majority of the board to select in October following the text-books, a state of case affording an opportunity for a majority of the commission to be composed of inexperienced members. We might also take into account the possibilities of death, resignation, or removal for cause.

We are therefore brought to the conclusion that the test urged by the appellants is not the true one to use, and that to exempt from the operation of section 3750 of the Statutes an appointment by the Governor to an office created by a statute, such statute must do so in terms or in substance by providing for approval in some other manner or way than by the Senate. As the act under discussion did not do this, it follows that the appointments therein provided are subject to confirmation by the Senate.

What effect did the failure of the Senate at its 1928 session to act on the appointments of Governor Fields have upon such appointments? Referring again to section 3750 of the Statutes, we find the provision that, unless otherwise provided, persons appointed to office by the Governor shall hold their offices subject to the advice and consent of the Senate, which body shall take appropriate action upon their appointments at its first session held thereafter. It was plainly the purpose of the Legislature to provide by this section that, unless otherwise provided, the title to office of one appointed to such office by the Governor finally vests in the appointee when his appointment has been confirmed by the Senate. The statute makes it the duty of the Senate to take action upon all such appointments at its first session held thereafter. As the Legislature was unwilling, unless it otherwise provided, to vest the appointments to office in the Governor except with the advice and consent of the Senate, it follows that the requirement that the Senate shall take action at its first session after the appointments is mandatory; otherwise the legislative purpose would be defeated. Wisely or not, it was unwilling to vest such appointments finally to the unfettered discretion and judgment of the Governor. His appointees were to hold office subject to the advice and consent of the Senate. And this body was to take action at its first session held after the appointments. Unless it did so act at such session, inasmuch as our Senate convenes in

regular session only biennially, the terms of office of the appointees of the Governor would, in most instances, be practically over before the Senate could take appropriate action. Thus the Governor would be free from the supervisory control over his appointments which the statute designed there should be. Keeping in mind the object sought to be accomplished and the fact that the authority conferred upon the Senate was one concerning the public interest and that to ignore the provision of the statute would be to defeat its purpose, we are convinced that the provision for action at the first session held after appointments is mandatory. Cf. McCreary v. Speer, 156 Ky. 783, 162 S. W. 99; Wait v. Southern Oil & Tar Co., 209 Ky. 682, 273 S. W. 473; 25 R. C. L. 770. This being true, what effect does its nonaction have? It certainly cannot be construed as a confirmation. In Morgan v. Champion, 150 Ky. 396, 150 S. W. 517, 518, the office of county road engineer was involved. The statute provided for his appointment by the county judge ''by and with the consent of the fiscal court.'' The county judge made the appointment. The orders of the fiscal court showed that the county judge reported his action to that court, and that two of the members of the court voted to ratify the appointment; the other four members not voting. The record did not show that they had been given an opportunity to vote. Invoking the general rule that, where a vote is being taken, those who are present and refuse to vote are taken as voting affirmatively, the appointee of the county judge endeavored to establish his title to the office. In denying his contention, we said:

> ''The distinction between consent as some active propulsion or expression of the mind, and mere acquiescence as a nonactive immobile condiiton, is drawn in the case of Plummer v. Commonwealth, 1 Bush 76. Consent was said to be an 'agreement of the mind to what is proposed or stated by another,' and that the mere standing by without volition, the mere acquiescence, was not a consent in the way of participation. In the case of Aull v. Columbia, etc., R. Co., 42 S. C. 431, 20 S. E. 302, it was held that consent implies some positive action as distinguished from a permission manifested by mere passivity. In Cocke v. Gooch, 5 Heisk. (Tenn.) 294, it was said that consent 'cannot be substituted for by a passive acquiescence.' In True v. Common-

wealth, 90 Ky. 651, 14 S. W. 684, 12 Ky. Law Rep. 594, an instruction against an accomplice in a murder was held bad because the consent demanded by the instruction was that of offering no resistance to the crime without the slightest contribution to it by the accomplice's own will. In State v. Cross, 12 Iowa, 66, 79 Am. Dec. 519, it was held that a submissive mind did not necessarily involve a consenting mind. In Philomath College v. Wyatt, 27 Or. 390, 31 P. 206, 37 P. 1022, 26 L. R. A. 68, it was held that in respect to suffrage consent meant the active concurrence of the voters, and not a passive acquiescence. In Crabb's Synonyms, the philologist, in differentiating to consent, to permit, and to allow, says that a consent is 'an express sanction to the conduct of others.'

"In Kentucky the rule is that, when an election is held at which a subject-matter is to be determined by a majority of the voters entitled to cast ballots thereat, those absenting themselves, and those who, being present, abstain from voting, are considered as acquiescing in the result declared by a majority of those actually voting. Montgomery County Fiscal Court v. Trimble, 104 Ky. 629, 47 S. W. 773, 42 L. R. A. 738, 20 Ky. Law Rep. 827. But in that case, as in the Ray case (140 Ky. 800, 131 S. W. 1039), the record disclosed that an election was held and every one entitled to vote had his opportunity to vote to say yes or to say no. Silence, passivity or acquiescence, therefore, in accord with the foregoing cases, cannot, in the case at bar, be said to be an affirmative consent, in the absence of any demonstrated opportunity to vote denying consent."

In the instant case, as no vote was ever taken in the Senate upon the appointments of Governor Fields, its nonaction as to such appointments cannot be, in the light of the Morgan case, a confirmation of them.

The Senate had the right at all times, had it so desired, to take up for action these appointments of Governor Fields. They had been duly entered upon the Executive Journal as section 91 of the Constitution, to which we have referred, requires. This journal was subject at all times to inspection by the Senate. It had under the Constitution the right to call for it. It was charged with notice of its contents. The Senate did not

have to wait for the Governor to submit it these appointments of Governor Fields, but could on its own initiative, without any executive communication from the Governor, institute and conduct investigation of recess appointments made by him and confirm or reject them. It was so held in the cases of Barrett v. Duff, 114 Kan. 220, 217 P. 918, 925, and People v. Shawver, 30 Wyo. 366, 222 P. 11, 23. In the latter case is a valuable discussion pointing out the difference between the power of the Wyoming Senate and the United States Senate in this regard, turning on the fact that, under the Federal Constitution, the President nominates appointees to office, whereas under the Wyoming law, the Governor appoints to office. On this point, the Wyoming court said:

"Notwithstanding the very infrequent use in our statutes of the word 'nominate' when directing an appointment by the Governor, with the consent of or to be confirmed by the Senate, a reference to the published legislative journals coming under our observation has disclosed the fact that the several Governors for at least 20 years have been in the habit of using a form of communication stating that the Governor nominates for the described office and term, and requesting the consent or confirmation of the Senate. That custom has no doubt resulted from using as a model the phraseology of presidential communications to the Senate of the United States submitting official nominations to that body. The use of the word in the case of federal appointments is proper to comply with the provision of the Constitution of the United States providing that the President shall 'nominate' and by and with the advice and consent of the Senate shall appoint. Said executive custom in this state, however, is not sufficiently potent, in our opinion, to require or justify the court, in determining the right of the Senate to exercise its confirming or rejecting power in the absence of executive communication, to consider the meaning or effect of the word 'nominate' or a provision that the Governor shall nominate, where a nomination is not required for the particular office in question. Nor, except in the very few instances in our statutes providing that the Governor shall nominate, do they contain anything

restricting the authority of the Senate in the exercise of its said power to cases where its action has been directly invited by a communication from the Governor, unless such restriction is to be implied from the fact that its power is to advise and consent to or confirm or to refuse to consent or confirm. And that we think presents a very important question and one upon which the authorities directly in point are few. They support, however, the contention that the Senate may act upon an appointment where such action is provided for by law, although the appointment has not been communicated to it by the executive or through his office.

"The orderly and contemplated method is of course an executive communication placing the matter before the Senate for its consideration, and that is the method usually employed here and elsewhere. We suppose also that upon a reasonable anticipation of a necessity therefor the Senate might request by resolution the submission to it of recess appointments which when so submitted it would be authorized to consider under its said power. But why may not the Senate act upon an appointment of which it has knowledge, if the Governor should refuse or neglect to ask for such action especially where the appointee is known to have entered upon the duties of the office? A provision for an appointment by the Governor with the consent of or to be confirmed by the Senate directs not only what shall be done, but also in effect what shall not be done. The affirmative act of the two governmental agencies is required to confer title to an office under such a provision. A completed appointment cannot be made in any other way than as so provided. People v. O'Toole, 164 Ill. 344, 45 N. E. 683; Clark v. State, 177 Ala. 188, 59 So. 259. While the Governor's act in selecting the person to be considered for an office may be the principal and perhaps the more important one of the two, it is not alone sufficient. A construction of such provision denying the right of the Senate to act in any case unless directly requested to do so by the Governor or by a communication from his office would obviously give him the power to ignore the co-ordinate right of the Senate, and might mean the abolition of that right, and certainly would make it entirely dependent upon the Gov-

ernor's pleasure. The probability of that effect
would be more marked, perhaps, where a recess
appointment for a fixed term is held to be effective
until rejected by the Senate, but under the rule
adopted in this state, and to which we adhere, that
confirmation when required is necessary to complete
an appointment, the same result would not be impos-
sible.''

On the same point, the Kansas court said:

"No good reason is advanced why the Senate
would not consider such recess appointments with-
out such direct word from the executive. . . .
The offices in controversy are all located in the
capitol building, in which the Senate holds its
deliberations. They are important departments of
the state government. The Senate may, and often
does, have official business with them. It receives
reports from them. It considers the service which
the departments are, by law, required to perform.
It considers the extent of such service and its
requirements. It considers and passes appropria-
tions in order that they may lawfully and properly
function. Under all the circumstances, the Senate
cannot shut its eyes to the facts as to whether the
respective offices are filled; whether they are func-
tioning under the law, or whether there is a vacancy
there. . . . The Senate, which has official knowl-
edge of all of the acts of another state department,
may not close its eyes to an existing fact merely
because the executive has failed to transmit a com-
munication giving it the advice. . . . The Senate
must be permitted to investigate on its own initia-
tive, and without communication from the Governor,
the status of offices; otherwise the Governor could
fill and refill them at his pleasure by simply failing
to advise the Senate. . . . The investigation by
the Senate brought before it the records of the sec-
retary of state showing the appointments of the
defendants. We conclude that the Senate did not go
beyond its powers in making the investigation, con-
cerning the offices held by the defendants, and, having
satisfied itself, that it could properly exercise its
judgment thereon.''

Section 3750 of the Statutes refers to appointments made by the Governor, and not nominations. Hence the Wyoming and Kansas cases are in point, and we think their reasoning on this question sound.

As the title to office of the appointees referred to in section 3750 of the Statutes is finally vested in such appointees when their appointments are confirmed by the Senate, and as the Senate must confirm, if it is going to confirm at all, at its first session held after the appointments are made by the Governor, and as it is charged with notice of the appointments entered on the Executive Journal and may take them up for action without waiting for an executive communication concerning them, and as a nonaction by the Senate is not confirmation, it must follow, to give any effect to the statute at all and to carry out its manifest purpose, that, if the appointments be not confirmed at the first session of the Senate following their making, they expire with the adjournment of the Senate, and while it may be true that, under the statutes which create their offices, the appointees may hold over until their successors are appointed and qualified, there is a vacancy which the Governor may fill.

Appellants argue, however, that conceding that the appointments here in question were of the character required to be confirmed by the Senate and that the Senate could have considered these appointments without any direct communication from the Governor concerning them, the nonaction on the part of the Senate should be considered a confirmation rather than a rejection, since under the facts the case falls within the rule of Montgomery County Fiscal Court v. Trimble, supra, rather than that of Morgan v. Champion, supra, because the Senate had an opportunity to vote and failed to do so. The rule of Trimble case is, as pointed out in the Morgan case, applicable only when "an election" is held and every one entitled to vote "has" his opportunity to vote and say "yes" or to say "no." No vote on the question of the confirmation of these appointments was ever taken by the Senate, and so the rule of the Trimble case is inapplicable, and the case of Morgan v. Champion controls.

What we have said being true, the appointments of Governor Fields both for the two-year and four-year terms expired with the adjournment of the 1928 Senate,

and Governor Sampson had the authority to appoint to the vacancies thus created.

Two other points are made by the appellants against the conclusions here reached. They contend: First, that the reason for denying the Governor arbitrary power of removal between the time of appointment and confirmation, as it is conceded section 3750 does (see also McChesney v. Sampson (Ky.) 23 S. W. (2d) 387), applies with equal force to such removal between the adjournment of the Senate after the appointment is made and the expiration of the term. Secondly, they urge that the power of the executive office was exhausted when Governor Fields appointed members of the state textbook commission, and such power could be revived only by action of the Senate in rejecting the parties named. Neither of said contentions militate against the conclusions herein reached. It would hardly be contended that if the Senate had, by vote taken, rejected the appointments of the Governor, then the right of the Governor to make other appointments could be questioned. And as the nonaction of the Senate is just such a rejection as an actual vote of rejection would have been, it follows that the power of the Governor to make other appointments is as comprehensive as it would have been after an actual vote of rejection.

So much as we have said applies to both the four-year and the two-year appointees of Governor Fields. As to the latter, there is yet another reason why their offices were vacant at the time Governor Sampson filled them.

Although it is true that, due to the fact that chapter 77 of the Acts of 1926 did not become effective until June of that year, for which reason it was impossible for the Governor to appoint its members in April, as section 1 of the act provided, it does not follow that therefore the Legislature intended that the term of office of the Governor's appointees should expire two and four years from the time of his appointments. In arriving at what the Legislature intended about when these terms of office should expire, it is a potent consideration to remember that, despite the elimination of the emergency clause, the Legislature refused to change the date when it said the terms of office of the members of the commission were to begin, and provided that such terms should expire two and four years from such appointment. This statement is not rested on conjecture, for we find on page

2780 of the House Journal of the 1926 Session a rejection of an amendment to this bill striking out the words "April, 1926," where it appears in section 1 of the act, and substituting the words "January, 1928." We conclude therefore that, although the legislative purpose that these appointments should be made in April, 1926, could not be carried out, since the act was not then in effect, its just as evident purpose that the terms of office thus created should expire in April of the even years following may and should be, for which reason the two-year appointments of Governor Fields could not extend beyond April, 1928. The judgment of the lower court being in accord with these views, it is affirmed.

Whole court sitting.